**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

GREGORY JAMES CONWAY,       )
                            )
                            )
          Plaintiff,        )
                            )
     v.                     )        Civil Action No. 14-cv-1792 (TSC)
                            )
UNITED STATES AGENCY FOR,   )
INTERNATIONAL DEVELOPMENT, *et al.* )
                            )
          Defendants.       )
                            )

## MEMORANDUM OPINION

Plaintiff Gregory James Conway is the nephew of Marilyn L. Allan.[1] (Def. Ex. 1 at 41). Allan, whose federal service records are at the heart of this case, served with the U.S. Agency for International Development ("USAID") as a nurse in Vietnam until 1967, when she was killed by U.S. Army Captain Larry Peters. (*Id.* at ¶¶ 14, 22). Pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, Conway sought documents from defendants the U.S. Army (on January 16, 2014) and USAID (on February 3, 2014) related to Allan's service and death. (*Id.*).

Defendants located no responsive records. Conway filed this lawsuit alleging failure "to provide . . . all non-exempt responsive records" and failure "to perform an adequate search for records responsive to Plaintiff's FOIA request in a manner reasonably calculated to locate responsive records." (Am. Compl. ¶¶ 31, 38). The parties have cross-moved for summary judgment. For the reasons set forth below, the motions are DENIED without prejudice.

---

[1] Allegedly, Allan also went by the name "Mary Lourdes." (Def. Ex. 1 at 1).

## I.  DEFENDANTS' SEARCHES

### A.  U.S. Army

#### i.  Records Systems

The U.S. Army Criminal Investigation Command (CIDC) "is the Army command responsible for investigating serious crimes whenever an Army interest exists and jurisdiction has not been reserved to another agency."  (Kardelis Decl. ¶ 3).  Its records are stored at the U.S. Army Crime Record Center.  (Kardelis Decl. ¶ 3).  The Record Center is not a records repository for all military offenses, but only for particular offenses of a certain severity which were investigated by the Army itself.  (*Id.* ¶ 3).  The CIDC has at least four law enforcement databases, including:

- the Army Criminal Investigation Criminal Intelligence System ("ACI2"), containing records dating from 1987;
- the Centralized Operations Police Suite ("COPS"), which contains, amongst other things, Military Police Reports dating from 2004;
- the Defense Central Index of Investigations ("DCII"), with records beginning in 1974; and
- the Automated System Crime Record Center ("ASCRC"), which contains the oldest records of the four computerized databases described by the CIDC, dating from 1971.

(Chidester Decl. ¶ 5).

Criminal Investigation files are retained at the Record Center for five years, then sent to the Washington National Records Center in Suitland, Maryland.  (Kardelis Decl. ¶ 8).  When transferred, the records are transmitted to the National Records Center "along with a copy of the inventory of those cases" being transferred for storage.  (*Id.* ¶ 8).  The National Records Center sends a "received" response along with a code denoting the location where the records will be stored.  (*Id.*).  Army's records management regulations require that military police investigation records be retained for 40 years.  (Chidester Decl. ¶ 8).

###### ii.  Searches

Conway's January 16, 2014 FOIA request to the Army sought "all agency records pertaining to Allan and Peters," including "any Army records of any investigations or reports of the [homicide]."  (Def. Ex. 1 at 1).  On January 30, 2014 the Army searched the four databases described in the Chidester Declaration.  (Chidester Decl. ¶ 4).  The Army also did a "thorough check" of its microfiche records, which date from between 1975 and 1987, and its physical records.  (*Id.*).  The search was conducted for "Marilyn L. Allan, Marilyn Lourdes, Larry Peters, homicide Vietnam and 1967 homicide in Nhatrang, Vietnam."[2]  (*Id.*).  This search located no Reports of Investigation or Military Police Reports pertaining to the August 16, 1967 homicide.  (*Id.* ¶ 4).  A search of inventory records from the National Records Center revealed no evidence of any responsive records that had been transferred there for storage.  (Kardelis Decl. ¶ 8).

###### B.  USAID

Conway's February 2014 FOIA request to USAID similarly sought "all records pertaining to the work of…Marilyn L. Allan."  (Def. Ex. 1 at 16).  USAID's FOIA office initially forwarded the request to the USAID Mission in Bangkok, Thailand, which oversees USAID work in Vietnam, believing that this mission was most likely to have responsive information.  (Winston Decl. ¶ 6).[3]  The Bangkok Mission consulted with the Vietnam Mission, which

---

[2] After initiation of this lawsuit, the Army conducted a search omitting the middle initial.  (Chidester Decl. ¶ 6).  A third search in November 2014 included an alternate middle initial.  (*Id.* ¶ 7).  This November 2014 search, however, may have utilized an incorrect spelling of Allan's last name (Allen).  (*Compare* Chidester Decl. ¶ 7 *with* Kardelis Decl. ¶ 7).

[3] USAID had previously conducted searches (which located no documents) in response to an earlier request (in early 2013) from Conway for "any and all files related to my Mother's sister, Marilyn Allan," which specified particular HR documents sought by Conway.  (Winston Decl. ¶ 8; Def. Ex. 1 at 41-43).  That request was also sent to Bangkok, and Bangkok also located no documents.  (*Id.* ¶ 9).  In response to the 2013 request, USAID had recommended Conway submit a request to the National Archives and Records Administration's National Personnel and Records Center.  (*Id.* ¶ 11).  Whether or not Conway followed USAID's recommendation is not in the record, although that may be irrelevant given that USAID appears to have searched the Records Center in response to the 2014 request.  *See infra* at 5.

concluded that "any documents that might have existed from the time period of the request would presumably have been sent USAID's [sic] Information and Records Division in Washington, DC, in accordance with USAID records retirement policies and procedures upon the Mission's closure following the [Vietnam] war." (Collins Decl. ¶ 7). The Vietnam Mission closed after the Vietnam War and reopened in 2000. (Collins Supp. Decl. ¶ 7). "Nothing from the former Mission office survives in the current Mission office," and records dating from Allan's service would have been returned to Washington. (*Id.*). The closure of the Vietnam mission after the war meant that any documents "related to the inclusion of Ms. Allan's name on the memorial wall located in the lobby of USAID's Headquarters" no longer reside in Vietnam. (*Id.*).

In December 2014, after Conway brought this case, USAID searched for records in its Bureau for Legislative and Public Affairs and the Office of Human Capital and Talent Management (formerly known as the Office of Human Resources). (Winston Decl. ¶ 15). The scope of this search – that is, the particular systems, locations and custodians searched – is not in the record. USAID states that it conducted this search in light of those offices' responsibilities for the USAID Memorial Program.[4] (*Id.*). USAID's Executive Secretariat then searched the Agency Correspondence and Tracking System for documents dated 2005 (the year the Memorial Wall was established) with a number of search terms, but located no relevant documents. (*Id.* ¶

---

[4] The USAID Memorial Wall honors those "whose lives were lost in the time of duty," including Marilyn Allen. (Def. Ex. 1 at 36; Conway Decl. Ex. D). Plaintiff points to USAID regulations requiring that records detailing "the circumstances surrounding the incident leading to the USAID-associated employee's inclusion on the" Memorial Wall be "maintained in perpetuity" as evidence that records concerning Ms. Allen must have been recently reviewed and should have been maintained. (Conway Decl. Ex. G at 7). USAID correctly notes that this regulation was added in 2008 (*id.*); it was not in effect when Ms. Allan's name was added to the wall. (Def. Reply at 10). This regulation, on its own, is insufficient to support Plaintiff's challenge to USAID's search efforts.

16).[5]  In that same month, USAID's Bureau for Management searched the e-mail account of a

"former USAID contract employee who coordinated the Memorial Wall ceremonies" for

documents containing the terms "Marilyn L. Allan," "Mary Lourdes" and various permutations

thereof.  (*Id.* ¶ 17).  No responsive records were located in that e-mail account.  (*Id.*).  The Office

of Human Capital and Talent Management conducted an electronic and paper records search for

documents related to the Memorial Wall and located no responsive records.  (*Id.* ¶ 18).  Finally,

on December 31, 2014, "in an effort to exhaust searches of potential sources of records related to

the request," USAID conducted a search of records in storage (and not in the possession of the

National Archives) due to a litigation hold in an unrelated matter.  (*Id.* ¶ 19).  This search was

not fruitful.  (*Id.*).

        Later, in March and May of 2015, USAID conducted additional searches, apparently in

response to arguments Conway raised in his summary judgment brief.  First, USAID requested

Allan's Official Personnel File from the National Personnel Records Center in St. Louis,

Missouri.[6]  (Winston Supp. Decl. ¶ 8).  St. Louis did not have the file, but directed USAID to the

U.S. Public Health Service, noting that Allan's death certificate listed that agency as her

employer.  (*Id.* ¶¶ 6,8).  "Allan was detailed to USAID under a Participating Agency Service

Agreement from the U.S. Public Health Service. Thus it appears that Ms. Allan was not an

employee of USAID, a fact that might explain USAID's inability to locate any responsive

personnel records regarding her service with the agency."  (Def. Reply at 8).

---

[5] USAID does not describe the Tracking System and does not explain which records are or are not included in it.

[6] The National Personnel Records Center (NPRC), located in St. Louis, Missouri, is the repository for twentieth-century personnel and medical records of former members of the military and personnel records of former civilian employees of the Federal Government."  36 C.F.R. 1250.8(b).

In response to Plaintiff's allegations regarding the inadequate search of the Vietnam Mission, USAID staff searched that Mission's electronic shared drive and the tabs of files in 28 file cabinets.  (Collins Supp. Decl. ¶¶ 8-9).  These physical and electronic searches used varied search terms, but neither located responsive records.  (*Id.*).  Finally, a USAID FOIA officer requested information from a Memorial Wall committee member, who provided the FOIA officer with "two folders of information" related to the Memorial Wall, but these contained no responsive records.  (Winston Supp. Decl. ¶ 10).  USAID assumes that "any records that might exist were transferred to NARA's [National Archives and Records Administration] custody." (Def. Mot. at 17-18).

## II.    LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002).  In determining whether a genuine issue of material fact exists, the court must view all facts in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The moving party bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotrex Corp.*, 477 U.S. at 323 (internal quotation marks omitted).  The nonmoving party, in response, must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Id*. at 324 (internal quotation marks omitted).  "If the evidence is merely

colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (citations omitted).

FOIA cases are typically and appropriately decided on motions for summary judgment. *Gold Anti-Trust Action Comm., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 762 F. Supp. 2d 123, 130 (D.D.C. 2011) (citations omitted). Upon an agency's motion for summary judgment on the grounds that it has fully discharged its FOIA obligations, all underlying facts and inferences are analyzed in the light most favorable to the FOIA requester; only after an agency proves that it has fully discharged its FOIA obligations is summary judgment appropriate. *Moore v. Aspin*, 916 F. Supp. 32, 35 (D.D.C. 1996) (citing *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1350 (D.C. Cir. 1983)). An agency will be granted summary judgment on the adequacy of its search if it "show[s] beyond material doubt that it has conducted a search reasonably calculated to uncover all relevant documents." *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (internal citation omitted). "The question is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was adequate." *Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994) (emphasis in original). An agency need not search each of its records systems. *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). Instead, a search may be reasonable if limited to all systems "that are likely to turn up the information requested." *Id.* Furthermore, the "adequacy of the search . . . is judged by a standard of reasonableness and depends, not surprisingly, on the facts of each case." *Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984). Courts are mindful, however, that "congressional intent tilt[s] the scale in favor of disclosure." *Morley*, 508 F.3d at 1114 (internal citation omitted).

To meet its burden on a summary judgment motion, the agency may rely on reasonably detailed, nonconclusory affidavits submitted in good faith. *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983). These declarations are "accorded a presumption of good faith which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citation omitted). The agency declaration can demonstrate reasonableness by "setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Sanders v. Obama*, 729 F. Supp. 2d 148, 155 (D.D.C. 2010), *aff'd sub nom.*, *Sanders v. U.S. Dep't of Justice*, No. 10-5273, 2011 WL 1769099 (D.C. Cir. Apr. 21, 2011) (citation omitted); *see also DeBrew v. Atwood*, No. 12-5361, 2015 WL 3949421, at *2 (D.C. Cir. June 30, 2015). The declaration must be sufficiently detailed to permit the requester the opportunity to challenge the search and for the district court to evaluate that challenge. *DeBraw*, 2015 WL 3949421, at *2.

## III.   ANALYSIS

### A.   Army

The Army did not conduct a search of any database containing records dating from 1967. The only search conducted by the Army which did not clearly exclude 1967-era documents was the "thorough check of all physical records on premises" conducted by Erin Chidester on January 30, 2014. (Chidester Decl. ¶ 4). The Army has not submitted declarations addressing the existence of other records systems and whether or not there are other extant records systems which could contain responsive records. *Sanders*, 729 F. Supp. 2d at 155; *Hall v. C.I.A.*, 881 F. Supp. 2d 38, 58 (D.D.C. 2012) ("a search of the systems 'most likely' to contain responsive records does not satisfy FOIA, because systems that are not the 'most likely' to contain documents may still be likely to contain responsive documents"). This evidentiary gap is

particularly relevant in this case, where the Army chose to search databases which contain only

certain types of records (e.g. Military Police Reports) and which do not date to the time of the

relevant investigation.  The Army's briefs suggest that the Army chose to search those databases

because no other databases were likely to contain responsive records exist.  (Def. Reply At 2

("[T]he Army conducted three separate searches using various search terms of all the existing

computerized databases in the" CIDC)).  However, the Army's declarant states only that she

searched four particular databases – *not* that she searched the only four databases in existence or

likely to contain responsive records.  (Chidester Decl. ¶ 5).  This evidentiary gap precludes

summary judgment.

In addition, the Army has not established beyond material doubt that the search terms it

used were appropriate.  To the contrary, several questions remain.  Chidester avers that she

searched electronically, physically, and in the microfiche archives for specific terms: "Marilyn L.

Allan, Marilyn Lourdes, Larry Peters, homicide Vietnam and 1967 homicide in Nhatrang,

Vietnam."  (Chidester Decl. ¶ 4).  She subsequently omitted the middle initial (*id.* ¶ 6), and later

searched using the middle initial "A."  (*Id.* ¶¶ 6-7).  It is not clear whether the search looked for

exact matches, e.g. "1967 homicide in Nhatrang, Vietnam," or for documents containing all

words, e.g. "1967" and "homicide" and "in" and "Nhatrang" and "Vietnam."[7]  It is similarly

unclear whether any documents identifying Allan as "Allan, Marilyn," would have been returned

in electronic searches for "Marilyn Allan."  The Army offered no explanation for its decision to

---

[7] Given that the "search terms" were applied to physical searches, exact matches seem like the unlikely alternative. The Army (and USAID) should provide a more detailed and accurate catalogue of the search terms used to search each records system in any renewed motion for summary judgment.

search for "Marilyn Lourdes" even though Allan's alias was "Mary Lourdes."[8]  (Def. Ex. 1 at 1).

Given the questions that remain, summary judgment is improper at this time.

Finally, Conway argues that the Army improperly assumed that records have been

destroyed and are not stored at the NRC, but did not follow up to confirm that this is the case.

Conway appears to argue that, notwithstanding the fact that there was no indication that records

pertaining to Allan had been transmitted to the NRC, the Army should have conducted an

independent search of the National Records Center.  (Conway Opp'n at 16).  Although Conway

is correct that leads must be followed, *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 327

(D.C. Cir. 1999), it does not appear based on the Army's searches to date that there is actually a

"lead" here for the Army to follow.

### B.  USAID

Conway correctly highlights a number of gaps in USAID's recitation of its search efforts.

(*See generally* Pl. Opp'n at 9-11).  First, USAID has provided no meaningful details about its

electronic records searches.  As noted above, USAID described in conclusory fashion its search

of records in its Bureau for Legislative and Public Affairs and Office of Human Capital; there is

no explanation of what search terms were used and how the records of those offices are

organized and maintained.  In addition, USAID searched the email account of a single former

contract employee (subsequently identified as Luigi Crespo (Winston Supp. Decl. ¶ 11)) who

planned the Memorial Wall ceremonies, but has not explained, among other things, 1) whether

Mr. Crespo had any responsibility for making eligibility determinations, 2) why it elected to

search the documents of the event coordinator only and not the documents of any and all

---

[8] It is similarly unclear from the record whether Captain Peters' first name was "Larry" or whether that was a
nickname and, if so, whether searches for "Larry Peters" would locate records utilizing Captain Peters' full first
name.

individuals with responsibility for making eligibility determinations.  Similarly, USAID sought information from a single Memorial Wall committee member (Winston Supp. Decl. ¶ 10), but has provided no explanation as to why it was reasonable to solicit documents from only that committee member and not the entire committee.

Finally, in its reply, USAID makes problematic contentions with regard to documents which may be in National Archives storage.  USAID contends that it previously "searched all Federal Records Centers where USAID stores and retains legal custody of records for information responsive to this request."  (Winston Supp. Decl. ¶ 7).  This refers back to the initial Winston Declaration, which describes no search of any Federal Records Center files.  (Winston Decl. ¶ 19).  The only reference to the National Archives or Federal Records Centers in the initial Winston Declaration is a statement that "any permanent records related to the request would have been transferred over to NARA's legal custody," (*id.*) and a related statement that, in response to Conway's 2013 FOIA request, the agency had suggested he contact the National Archives.  (*Id.* ¶ 11).  Contrary to the Supplemental Winston Declaration, this does not establish that USAID conducted searches of all Federal Records Centers where USAID stores documents.

The parties dispute whether USAID has any obligation to search for records stored by the National Archives.  Citing to regulations which require FOIA requesters to submit requests for documents held by the National Archives to the originating agency, Plaintiff argues that USAID's failure to look for any such records rendered its search unreasonable.  (Pl. Opp'n at 13).  USAID counters that records in the National Archives' legal and physical custody are subject to FOIA requests directed to the National Archives, and that USAID is not obliged to search for those records.  (Winston Decl. ¶ 7; Def. Reply at 8).

This contradiction appears to stem from the fact that each party cites to regulations applicable to different categories of documents.  USAID cites to regulations governing the permanent legal transfer of records to the National Archives.  Documents which have been transferred to the permanent *custody* of the National Archives are subject to FOIA requests made *to* the National Archives.  36 C.F.R. § 1250.8(a).  Conway cites to a regulation governing the custody of records which the National Archives merely stores for an agency prior to full legal transfer.  36 C.F.R. § 1250.8(c).  For purposes of FOIA, records in this category are subject to FOIA requests made to the originating agency.  *Id.* ("Requests for access to another agency's records in a NARA Federal records center should be made directly to the originating agency. [The National Archives does] not process FOIA requests for these records.").  The Supreme Court recognizes that agencies remain responsible for FOIA requests for records over which "they have chosen to retain possession or control."  *Kissinger v. Reporters Comm. for Freedom of Press*, 445 U.S. 136, 151-52 (1980).

The determinative question, therefore, is whether any responsive records could reasonably be expected to be located among USAID documents stored with the National Archives and, if so, whether those documents have been legally transferred to the National Archives' permanent custody or whether the records remain in the legal custody of USAID.  USAID's vague references to searches of "all Federal Records Centers where USAID stores and retains legal custody of records" answer neither question.  (Winston Decl. ¶ 7).  It remains unclear where USAID stores its records, how many locations and/or records were searched, whether records were permanently transferred to the National Archives, and in whose custody any records may reside.  *Id.*  Until USAID provides clarity on those issues, summary judgment is inappropriate.  *See, e.g., Parker v. United States DOJ*, 852 F. Supp. 2d 1, 9 (D.D.C. 2012)

12

(denying summary judgment where the government failed to demonstrate whether records had ever been physically transferred to the National Archives).

## IV.     CONCLUSION

Too many questions concerning the adequacy of USAID and the Army's searches remain for the court to grant summary judgment in this matter.  Accordingly, the motion and cross-motion for summary judgment must be denied.

A corresponding order will issue separately.

Dated: August 17, 2015